## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ANGELA IRBY, individually and
on behalf of her minor daughters,
K.I. and K.I.,
LAZHANTE ANDERSON, and
TODD LOPEZ, as wrongful death
personal representative for the Estate of
William Irby, deceased,

     Plaintiffs,

                                            Case No. 2:24-cv-00094-MIS-JHR

v.

JEFFERSON INSURANCE COMPANY, and
AGA SERVICE COMPANY d/b/a
Allianz Global Assistance,

     Defendants.

### ORDER DENYING DEFENDANTS' CONSTRUED PARTIAL MOTION FOR JUDGMENT ON THE PLEADINGS

THIS MATTER is before the Court on Defendants Jefferson Insurance Company and AGA Service Company d/b/a Allianz Global Assistance's ("Defendants") Partial Motion to Dismiss per Fed. R. Civ. P. 12(b)(6), filed February 6, 2024, ECF No. 10, which the Court construes as a Motion for Judgment on the Pleadings. Plaintiffs Angela Irby, individually and on behalf of her minor daughters, K.I. and K.I., LaZhante Anderson,[1] and Todd Lopez, as wrongful death personal representative for the Estate of William Irby, deceased ("Plaintiffs"), filed a Response on March 19, 2024, ECF No. 18, to which Defendants filed a Reply on April 22, 2024, ECF No. 21. Upon review of the Parties' submissions and the relevant law, the Court will **DENY** the Motion.

---

[1] Mr. Anderson's first name is spelled "LaZhante" in the case caption of all of Plaintiffs' filings and in the "Parties, Jurisdiction, and Venue" section of the Complaint, but is spelled "LaZhonte" in in other sections of the Complaint. The Court will utilize the "LaZhante" spelling unless and until Plaintiffs ask the Clerk's Office to amend the case caption.

## I.    Background[2]

In early 2015, Decedent William Irby ("William") was diagnosed with heart failure due to viral myocarditis.  ECF No. 1-2 ¶ 29.  The same year, William married Plaintiff Angela Irby ("Angela").  Id. ¶ 31.  Angela had a son from a prior relationship, Plaintiff LaZhante Anderson, "who William became very close with, loved dearly, and raised as his own, both before and after Angela and William married."  Id. ¶ 28.

In 2016, William received a heart transplant.  Id. ¶ 32.  He initially struggled with organ rejection but later stabilized and had no further incidents after 2017.  Id. ¶ 33.

In 2019, William and Angela had twin daughters, Plaintiffs K.I. and K.I.  Id. ¶ 36.  William, Angela, LaZhante, and the twins lived together as a family unit in New Mexico.  Id. ¶ 37.

After the onset of the COVID-19 pandemic, Defendants began advertising Travel Insurance Policies with an "Epidemic Coverage Endorsement" that provided COVID-related coverage.[3]  Id. ¶ 44.  One of Defendants' advertisements touted how the benefit for Emergency Medical Transportation may apply if the insured was diagnosed with COVID-19 while travelling. See id. ¶ 45.  It stated, in part:

> If you're diagnosed with an epidemic disease such as COVID-19 while you're traveling and you require an emergency medical evacuation, then your Emergency Transportation benefit can help. Our medical team will consult with the local doctor. If they determine that the local medical facilities are unable to provide adequate treatment, then our team can arrange and pay for emergency medical transportation to the nearest appropriate hospital.

---

[2]    The Court accepts the truth of all well-pleaded factual allegations in Plaintiffs' Complaint and draws all reasonable inference in Plaintiffs' favor.

[3]    The Complaint alleges: "Jefferson and Allianz were engaged in a joint venture with respect to the sale and administration of the insurance policy at issue in this case. Jefferson and Allianz are sister corporations, both owned by parent company Allianz Worldwide Partners. Jefferson underwrote and issued the policy, while Allianz was both the selling 'producer' of the Policy and the third-party administrator of the policy's claims. Both Jefferson and Allianz had a financial interest in the sale and administration of the Policy at issue in this case, both had joint control over the single business undertaking, and both shared profits and losses from the sale and administration of the Policy." ECF No. 1-2 ¶ 22.

Id.

William and Angela (hereafter, "the Irbys") purchased a Travel Insurance Policy from Defendants in New Mexico to cover a November 2021 vacation to Turks and Caicos. Id. ¶¶ 1, 16-17, 43, 46. The Policy provided, inter alia, $250,000 of coverage for Emergency Transportation, including for what the Policy refers to as "Emergency Evacuation" to the nearest appropriate hospital in the event an insured becomes seriously ill and the local medical facilities are unable to provide appropriate medical treatment. Id. ¶ 47. The Policy also included $50,000 for Emergency Medical Coverage, $10,000 for Travel Accident Coverage, and a provision for repatriation of remains under which Defendants would arrange and pay to transport the insured's remains to a funeral home near the insured's primary residence or another funeral home located in the United States. Id. ¶ 48. The Irby's fully paid the Policy's premiums. Id. ¶¶ 18, 171.

On November 2, 2021, William and Angela flew from El Paso International Airport to Miami where they spent the night. Id. ¶¶ 49, 51. On November 3, 2021—the day the Policy went into effect—they flew from Miami to Turks and Caicos. Id. ¶¶ 50-51. William and Angela both were fully vaccinated against COVID-19 and both tested negative for COVID-19 immediately prior to boarding the flight in Miami to Turks and Caicos. Id. ¶¶ 52-53.

On November 5, 2021, William began to feel ill and developed a fever, so the Irbys went to a hospital in Turks and Caicos. Id. ¶¶ 54-55. At approximately 1:00 a.m. on Saturday, November 6, 2021, William tested positive for COVID-19 at the hospital. Id. ¶ 57. Dr. Natasha Farnum advised William to "get off the island as soon as possible" due to inadequate hospital facilities to treat William's unique condition as a post-transplant COVID-positive patient. Id. ¶ 58. "The worry was that if William's illness were to worsen, he could die due to the hospital's

inadequate staffing, medicines, and equipment." Id.  Dr. Farnum's treatment note from November 6, 2021 states, in part:

> Case discussed with Dr. Davis (Locum Internist on call)
> Likely mild case of Covid as he is fully vaccinated
> Due to previous viral myocarditis best to medevac back to USA
>
> * * *
>
> Patient and his wife advised that they are to isolate in their hotel room and advise all persons who have been near them to call the Covid Hotline for testing today.
>
> Advised to call their private insurance company to arrange for Medical Evacuation to the USA as soon as possible.  Informed that there are no cardiologists or cardiothoracic surgeons in TCI [Turks and Caicos Island] to assist in an acute cardiac event.

Id. ¶ 59.  The hospital told the Irbys that there was nothing the doctors could do for William if his condition worsened and instructed them to quarantine.  Id. ¶¶ 60-61.  The hospital provided William acetaminophen, and an ambulance transported the Irbys back to their hotel.  Id. ¶¶ 63-64. Because William had tested positive for COVID-19, the Irbys could not leave Turks and Caicos on a commercial flight.  Id. ¶ 62.

Shortly after returning from the hospital on November 6, 2021, William and Angela called Defendants to open a claim for emergency medical evacuation coverage.  Id. ¶ 65.  They spoke with a representative who was located in Virginia.  Id. ¶ 67.  William explained to the representative that he received a heart transplant in 2016, that he was ill with COVID-19, and that the doctors had instructed him to evacuate as soon as possible because they did not have the ability to treat his condition.  Id. ¶ 69.  The representative asked the Irbys to email William's medical records to him, which Angela did shortly after the call.  Id. ¶¶ 71, 76.  The representative informed the Irbys that Defendants would review the medical records and would get back to them shortly as to whether emergency evacuation coverage would be provided.  Id. ¶ 75.

4

The Irbys did not hear back from Defendants on November 6th or 7th, and William's condition continued to worsen.  Id. ¶¶ 77-79.

On November 8, 2021, Angela called Defendants.  Id. ¶ 80.  Defendants "had done nothing to approve the Emergency Medical Evacuation claim, now two days after the claim was opened." Id. ¶ 85.  Over the course of the day, Angela had at least three phone conversations with Defendants' representatives, including with two case managers and a nurse consultant, explaining to each of them the need to immediately evacuate William.  Id. ¶¶ 80-96.

Angela called Defendants again on the morning of November 9, 2021, informing a case manager that William's breathing was getting worse and that he was in pain, and reiterating that William needed to be evacuated immediately.  Id. ¶¶ 97-98, 101.  The case manager promised to reach out to Defendants' medical team and then call Angela back shortly.  Id. ¶ 108.  In the meantime, William's condition continued to decline to the point where Angela called an ambulance to take William back to the hospital.  Id. ¶¶ 109-10.  The medical treatment note from the hospital on November 9, 2021 shows that William was in respiratory distress and that he had highly abnormal blood test results indicative of systemic inflammation and the beginning of potential organ failure.  Id. ¶ 114.

A doctor from the hospital in Turks and Caicos called Defendants later in the day and related that William was now experiencing respiratory distress, that he was a prior heart transplant recipient, that Turks and Caicos did not have an intensive care unit that could treat him, and that William needed to be transferred to the United States that same day.  Id. ¶ 115.  Plaintiffs allege that at some point after William was readmitted to the hospital in Turks and Caicos on November 9, 2021, Defendants finally began efforts to secure a medical air evacuation for William.  Id. ¶ 116. Later that evening, one of Defendants' representatives called Angela and reported that the Turks

and Caicos airport would be closing soon and it was possible that the air evacuation would not take place until the next morning. Id. ¶ 117. Angela called Defendants back that evening and told Defendants that the doctor wanted William evacuated that night and that the doctor would arrange to keep the airport open if Defendants arranged for an aircraft. Id. ¶ 118. Later in the evening, one of Defendants' representatives called Angela to tell her that they would not be able to transport William that evening. Id. ¶¶ 122, 124.

Ultimately, Defendants contracted with a medical air evacuation company to charter a flight from Turks and Caicos to Miami and arranged for a bed for William at Jackson Memorial Hospital in Miami. Id. ¶¶ 128, 130. The Irby's were flown from Turks and Caicos to Miami late in the afternoon on November 10, 2021. Id. ¶ 132.

By the time William arrived at Jackson Memorial he was experiencing respiratory failure and his lab results showed kidney and liver problems. Id. ¶ 135. On November 17, 2021, William was intubated and pharmacologically sedated and paralyzed. Id. ¶ 141. On December 17, 2021, William passed away due to septic shock and acute hypoxic respiratory failure secondary to COVID at the Jackson Memorial Intensive Care Unit. Id. ¶ 145.

Defendants have not reimbursed Angela for the medical expenses incurred in treating William at the hospital in Turks and Caicos, id. ¶ 166, or for the cost of repatriating his remains to Alamogordo Funeral Home, id. ¶ 167, and has not paid any Travel Accident Coverage benefits, id. ¶ 168.

Additional facts will be developed where relevant to the Court's discussion.

## II. Procedural history

On December 14, 2023, Plaintiffs filed the instant Complaint in the First Judicial District Court in Santa Fe County, New Mexico, asserting the following causes of action:

- <u>Count I</u> asserts a claim for breach of contract on behalf of Angela Irby, William Irby (survival claim), and the Estate of William Irby, alleging that Defendants breached the contract of insurance by delaying or denying coverage for Emergency Evacuation, Emergency Medical Benefits, Repatriation of Remains, and Travel Accident Death benefits, <u>id.</u> ¶¶ 170-84;

- <u>Count II</u> asserts a claim for bad faith breach of insurance contract on behalf of Angela Irby and the Estate of William Irby, <u>id.</u> ¶¶ 185-206;

- <u>Count III</u> asserts a claim for violation of New Mexico's Unfair Insurance Practices Act ("UIPA"), N.M. Stat. Ann. § 59A-16-20, on behalf of Angela Irby and the Estate of William Irby, <u>id.</u> ¶¶ 207-12;

- <u>Count IV</u> asserts a claim for violation of New Mexico's Unfair Practices Act ("UPA"), N.M. Stat. Ann. § 57-12-2, on behalf of Angela Irby and the Estate of William Irby, <u>id.</u> ¶¶ 213-20;

- <u>Count V</u> asserts a claim for negligent, intentional, willful, or reckless misconduct resulting in wrongful death on behalf of the Estate of William Irby, <u>id.</u> ¶¶ 221-33; and

- <u>Count VI</u> asserts a claim for loss of consortium on behalf of Angela Irby, LaZhante Anderson, K.I., and K.I., <u>id.</u> ¶¶ 234-47.

On January 30, 2024, Defendants removed the case to the United States District Court for the District of New Mexico based on diversity of citizenship.  ECF No. 1 at 3-6.

On February 6, 2024, Defendants filed an Answer to the Complaint which includes affirmative defenses.  ECF No. 9.  Defendants' first affirmative defense asserts that "Plaintiffs fail to state claims upon which relief can be granted."  <u>Id.</u> at 9.

Also on February 6, 2024, but <u>after</u> they filed their Answer, Defendants filed the instant Partial Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6).  ECF No. 10.  Plaintiffs filed a Response, ECF No. 18, to which Defendants filed a Reply, ECF No. 21.

As more fully explained in Section IV, <u>infra</u>, a motion to dismiss filed after an answer is procedurally improper.  Consequently, the Court construes the motion as one for judgment on the pleadings.

### III.    Legal Standard

"After the pleadings are closed[4]—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6)."  <u>Atl. Richfield Co. v. Farm Cred. Bank of Wichita</u>, 226 F.3d 1138, 1160 (10th Cir. 2000) (citing <u>Mock v. T.G. & Y. Stores Co.</u>, 971 F.2d 522, 528 (10th Cir. 1992)).

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move for dismissal if a complaint fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  This pleading standard does not impose a probability requirement, but it demands "more than a sheer possibility that a defendant has acted unlawfully."  <u>Id.</u>  Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not suffice.  <u>Twombly</u>, 550 U.S. at 555.  Although the court

---

4        "[T]he pleadings are closed for the purposes of Rule 12(c) once a complaint and answer have been filed, assuming, as is the case here, that no counterclaim or cross-claim is made." <u>Doe v. United States</u>, 419 F.3d 1058, 1061 (9th Cir. 2005) (citations omitted).  <u>See also</u> <u>Luman v. Balbach Transp. Inc.</u>, No. 2:20-CV-00200-WJ/CG, 2020 WL 6392765, at *3 (D.N.M. Nov. 2, 2020); <u>Tapp v. Wash. Metro. Area Transit Auth.</u>, 306 F. Supp. 3d 383, 391 (D.D.C. 2016) (Brown Jackson, J.); <u>McGuigan v. Conte</u>, 629 F. Supp. 2d 76, 80 (D. Mass. 2009).

must accept the truth of all properly alleged facts and draw all reasonable inferences in the plaintiff's favor, the plaintiff still "must nudge the claim across the line from conceivable or speculative to plausible." Brooks v. Mentor Worldwide LLC, 985 F.3d 1272, 1281 (10th Cir. 2021).

## IV.    Discussion

Initially, the Court finds that Defendants' Partial Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) is procedurally improper. See Est. of Stevens ex rel. Collins v. Bd. of Comm'rs of Cnty. of San Juan, 53 F. Supp. 3d 1368, 1371 (D.N.M. 2014). A Rule 12(b)(6) motion "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). That is, a Rule 12(b)(6) motion to dismiss must be filed, if at all, "before filing an answer." Est. of Stevens, 53 F. Supp. 3d at 1371-72; see also Swearingen v. Honeywell, Inc., 189 F. Supp. 2d 1189, 1193 (D. Kan. 2002) ("Technically, it is impermissible under the Federal Rules to submit an answer and thereafter file a Rule 12(b)(6) motion to dismiss."). Thus, even though Defendants filed their Answer and Motion to Dismiss on the same day, the Motion to Dismiss is procedurally improper because it was filed after Defendants filed their responsive pleading. See Brewer v. Pineiro, CV422-264, 2024 WL 1261706, at *4 (S.D. Ga. Feb. 27, 2024) (finding that a motion to dismiss filed "shortly after" an answer was "procedurally improper"); Yarbough v. Kaiser Permanente Ga. Region, CIVIL ACTION NO. 1:20-CV-4484-WMR-CCB, 2021 WL 3929570, at *3 (N.D. Ga. June 29, 2021) (finding a motion to dismiss filed after the answer to be procedurally improper even though it was filed on the same day as the answer).

However, because parties are permitted to assert a failure-to-state-a-claim defense in a Rule 12(c) motion for judgment on the pleadings after the pleadings have closed, and because Rule 12(c) motions are reviewed under the same standards as Rule 12(b)(6) motions, "courts will

routinely convert an untimely motion to dismiss for failure to state a claim into a motion for judgment on the pleadings." Est. of Stevens, 53 F. Supp. 3d at 1372 (citations omitted); see also Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 n.2 (10th Cir. 2002) (stating that a motion to dismiss filed after the answer "should generally be treated as a motion for judgment on the pleadings"); Gilliam v. USD No. 244 Sch. Dist., 397 F. Supp. 2d 1282, 1284 (D. Kan. 2005) ("The court will construe these [motions to dismiss] as motions for judgment on the pleadings because they were filed after defendants filed their answers to plaintiff's complaint."). Here, the Court finds that construing the Partial Motion to Dismiss as one for partial judgment on the pleadings is appropriate because Defendants asserted the failure-to-state-a-claim defense in their Answer. See ECF No. 9 at 9.

Turning to the Motion, Defendants assert that "Plaintiffs' Complaint implicates four (4) different jurisdictions: Florida, New Mexico, [Turks and Caicos], and Virginia." ECF No. 10 at 6. However, they argue that "the Court does not need to determine which jurisdiction's law applies now" because there is no conflict of law among the four jurisdictions with respect to the arguments raised in their Motion. Id. In their Response, Plaintiffs agree there is no conflict of law issue. ECF No. 18 at 3-4. Because the Parties agree that there is no conflict of law issue at this stage, and because Plaintiffs assert their claims under New Mexico law, the Court will apply New Mexico law where possible.

On the merits, Defendants argue that: (1) all claims other than the wrongful death claim are excluded by the applicable wrongful death statute, id. at 7-9; (2) the Complaint fails to state a claim for bad faith breach of the insurance contract, id. at 9-11; and (3) the Complaint fails to state a claim under New Mexico's Unfair Practices Act, N.M. Stat. Ann. § 57-12-2, id. at 11-12.

### a. Wrongful death statute as exclusive remedy

First, Defendants vaguely argue that the applicable wrongful death statute is Plaintiffs' "exclusive remedy."  ECF No. 10 at 7 (citing, inter alia, Romero v. Byers, 872 P.2d 840, 845 (N.M. 1994)).

Plaintiffs argue that William's family has viable claims that are unaffected by the Wrongful Death Act.  ECF No. 18 at 12-14.  They argue that because Angela was a party to the contract of insurance, she has contractual claims and claims under New Mexico's UIPA and UPA.  Id. at 12-13.  They further argue that Angela, LaZhante, K.I., and K.I. have viable claims for loss of consortium.  Id. at 14 (citing McNeese v. United States, 1:17-cv-01164 KWR/KK, 2020 U.S. Dist. LEXIS 11466, at *8 (D.N.M. Jan. 22, 2020); Romero, 872 P.2d at 847); see also id. at 14-15.  They further argue that New Mexico's Wrongful Death Act

> does not create a theory of liability. It is, rather, a vehicle that transmits a claim that the victim would have had but for his death (under the common law) to the surviving heirs. What exactly the "wrongful act, neglect or default" is under the Wrongful Death Act that justifies an award in any given case could be based on various theories, whether that be insurance bad faith, negligence, product liability, medical malpractice, etc.

Id. at 17 (citing N.M. Stat. Ann. § 41-2-1).  Plaintiffs further note that Defendants deny that they caused William's death and argue that if the finder of fact agrees with Defendants, William's Estate has viable tort and contract claims under New Mexico's survival statute.  Id. at 15-18 (citing N.M. Stat. Ann. § 37-2-1).  However, Plaintiffs concede that "insofar as Defendants' conduct caused William's death, the [E]state's wrongful death and insurance bad faith claims overlap and essentially amount to the same thing. . . . ."  Id. at 18 (footnote omitted).

In their Reply, Defendants dispute Plaintiffs' assertion that the Wrongful Death Act does not create a theory of liability and merely serves as a vehicle to transmit claims that the victim

would have had but for his death to the surviving heirs.  ECF No. 21 at 4-5 (citing <u>Romero</u>, 872 P.2d at 845).  They further argue that even if the Court disagrees with Defendants' Motion, Plaintiffs' wrongful death claim should be dismissed because Plaintiffs concede that "it is allegedly not a separate cause of action but rather 'merely an umbrella vehicle for one or more specific theories of liability.'"  <u>Id.</u> at 5.

Under the facts of this case, the Court rejects Defendants' argument that the Wrongful Death Act is Plaintiffs' "exclusive remedy."   New Mexico's Wrongful Death Act provides:

> Whenever the death of a person shall be caused by the wrongful act, neglect or default of another, although such death shall have been caused under such circumstances as amount in law to a felony, and the act, or neglect, or default, is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or the corporation which, would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured.

N.M. Stat. Ann. § 41-2-1.  Under this statute, "a personal injury claim [survives] the death of the injured."  <u>Chavez v. Regents of Univ. of N.M.</u>, 711 P.2d 883, 885 (N.M. 1985).  The claim must

> be brought by and in the name of the personal representative of the deceased person, and the jury in every such action may give such damages, compensatory and exemplary, as they deem fair and just, taking into consideration the pecuniary injury resulting from the death to the surviving party entitled to the judgment, or any interest in the judgment, recovered in such action and also having regard to the mitigating or aggravating circumstances attending the wrongful act, neglect or default.

N.M. Stat. Ann. § 41-2-3.  Thus, New Mexico's Wrongful Death Act "'transmits to the personal representative the cause of action which the injured person would have had if death had not ensued.'"  <u>THI of N.M. at Hobbs Ctr., LLC v. Spradlin</u>, 532 F. App'x 813, 817 (10th Cir. 2013) (quoting <u>Stang v. Hertz Corp.</u>, 463 P.2d 45, 55 (N.M. Ct. App. 1969)).  It "confers upon the beneficiaries those rights that the decedent would have possessed had he lived."  <u>Id.</u> (citing N.M.

Stat. Ann. § 41-2-1; <u>Romero</u>, 872 P.2d at 846).  It "ensures that the death of an injured person will not prevent a cause of action against a responsible party."  <u>Lopez v. Presbyterian Healthcare Servs.</u>, __ P.3d __, 2024 WL 1616148, at *2 (N.M. Ct. App. 2024).

First, Defendants do not appear to seriously argue that the Wrongful Death Act precludes Angela, LaZhante, K.I., and K.I.'s claims for loss of consortium.  To the extent that they do, the Court rejects the argument because it is well-established in New Mexico that the Wrongful Death Act does not preclude claims for loss of consortium by persons with "[a] very close and intimate relationship with the [deceased] party[.]"  <u>Fitzjerrell v. City of Gallup ex rel. Gallup Police Dep't</u>, 79 P.3d 836, 840 (N.M. Ct. App. 2003) (citing <u>Fernandez v. Walgreen Hastings Co.</u>, 968 P.2d 774, 784 (N.M. 1998)).  <u>See also Haceesa v. United States</u>, 309 F.3d 722, 734 (10th Cir. 2002); <u>Romero</u>, 872 P.2d at 843-45.  Defendants do not argue that the Complaint fails to allege that Angela, LaZhante, K.I., and K.I. had a very close and intimate relationship with William.  Regardless, accepting Plaintiffs' allegations as true and drawing all reasonable inferences in the light most favorable to Plaintiffs, the Court finds that the Complaint plausibly alleges that Angela, LaZhante, K.I., and K.I. each had a very close and intimate relationship with William.  <u>See, e.g.</u>, ECF No. 1-2 ¶ 28 (alleging that "William became very close with [LaZhante], loved [LaZhante] dearly, and raised [LaZhante] as his own, both before and after Angela and William married"); <u>id.</u> ¶ 31 ("William and Angela were married on May 23, 2015"); <u>id.</u> ¶ 34 ("Angela was by his side through William's heroic battle with his heart problems"); <u>id.</u> ¶ 36 ("In 2019, William and Angela welcomed the birth of their twin daughters, [K.I. and K.I.]"); <u>id.</u> ¶ 37 ("Angela, William, LaZhonte [sic], [K.I. and K.I.] all lived together as a family unit in New Mexico"); <u>id.</u> ¶ 38 ("Angela, William, LaZhonte [sic], [K.I. and K.I.] were a happy and loving family"); <u>id.</u> ¶ 235 ("William was 49 years old and had been married to Plaintiff Angela Irby for six years at the time of his

death"); <u>id.</u> ¶ 236 ("William and Angela had a loving, close, and dependent relationship"); <u>id.</u> ¶ 240 ("William referred to LaZhonte [sic] and introduced him to others as his 'son'"); <u>id.</u> ¶ 242 ("William undertook the responsibility of providing financial, emotional, and other support for LaZhonte [sic] both before and after his marriage to Angela"); <u>id.</u> ¶ 244 ("William, Angela, LaZhonte [sic], [K.I. and K.I.] all lived together at their home in Alamogordo, New Mexico prior to William's untimely death, and were mutually dependent on one another, both emotionally and financially"); <u>id.</u> ¶ 245 ("Angela, LaZhonte [sic], [K.I. and K.I.] . . . , but for William's untimely death, would have continued to rely on William for guidance, companionship, assistance, and support, both financial, emotional, and otherwise, throughout their lives"); <u>see also</u> <u>id.</u> ¶¶ 35, 39, 237-39, 241, 243.  Consequently, their claims for loss of consortium (Count VI) are not precluded by the Wrongful Death Act.  <u>See</u> <u>State Farm Mut. Auto. Ins. Co. v. Luebbers</u>, 119 P.3d 169, 180 (N.M. Ct. App. 2005) (holding that the child of the decedent may bring a loss of consortium claim separately from the wrongful death claim of his father, "but his damages are limited to the value to him of the loss of Father's love, care, society, companionship, and the like").

Next, Defendants do not appear to seriously argue that the Wrongful Death Act precludes Angela from suing Defendants for breach of contract and for violations of New Mexico's Unfair Insurance Practices Act and Unfair Practices Act for damages to which she may <u>personally</u> be entitled.  To the extent that they do, the Court rejects the argument because nothing in the Wrongful Death Act prohibits a living person from pursuing such claims on her own behalf, and the Complaint plausibly alleges that Angela was a party to the insurance contract and transaction underlying Counts I through IV.  <u>See</u> ECF No. 1-2 ¶¶ 15-18 (alleging that the insurance policy was marketed, sold and delivered to "the Irbys" and that the premiums were paid by "the Irbys"); <u>id.</u> ¶ 46 ("On October 28, 2021, Angela and William purchased a Travel Insurance Policy from

Allianz/Jefferson, Policy Number EUSP2226027765[.]").   Therefore, Angela's claims against Defendants for breach of contract (Count I), bad faith breach of insurance contract (Count II), and violating New Mexico's UIPA (Count III) and UPA (Count IV), are not precluded by the Wrongful Death Act.

The real issue is whether the Wrongful Death Act precludes the Estate's claims for breach of contract (Count I), bad faith breach of insurance contract (Count II), and violations of New Mexico's Unfair Insurance Practices Act (Count III) and Unfair Practices Act (Count IV).  This appears to be a matter of first impression in New Mexico.

Defendants rely entirely on Romero's declaration that the Wrongful Death Act "is the exclusive remedy governing wrongful death actions in New Mexico."  872 P.2d at 845.  However, the Court does not interpret this statement as extinguishing all other claims a decedent's estate may have against a party that, in addition to being the tortfeasor who committed the wrongful act that caused the decedent's death, also allegedly (1) breached a contract with the decedent (2) violated New Mexico's Unfair Insurance Practices Act, and (3) violated New Mexico's Unfair Practices Act vis-à-vis a transaction with the decedent.  The Estate's claims in Counts I, III, and IV are not claims for wrongful death and therefore the Wrongful Death Act does not govern or extinguish them.

With regard to Count II, Plaintiffs' concede that to the extent that Defendants' conduct caused William's death, the Estate's "wrongful death and insurance bad faith claims overlap and essentially amount to the same thing. . . . ."  ECF No. 18 at 18 (footnote omitted).  However, as Plaintiffs correctly note, see id., Defendants deny that they caused William's death, and the finder of fact may ultimately agree with them.  If the factfinder concludes that Defendants did not cause William's death, then Count II is not duplicative of a wrongful death claim.  The Wrongful Death

15

Act precludes the Estate's bad faith breach of insurance contract claim <u>only if</u> the finder of fact concludes that Defendants caused William's death—a question not ripe for adjudication at the pleadings stage.  Thus, although Plaintiffs may not recover under both theories, the Court agrees with Plaintiffs that a bad faith breach of insurance contract claim may be pled in the alternative to the wrongful death claim.  <u>See</u> <u>Boulware v. Baldwin</u>, 545 F. App'x 725, 729 (10th Cir. 2013) ("Federal pleading rules have for a long time permitted the pursuit of alternative and inconsistent claims.").  Consequently, the Court finds that the Wrongful Death Act does not preclude the Estate from pleading an alternative claim for bad faith breach of insurance contract (Count II).

As further support for the conclusion that the Wrongful Death Act did not extinguish the Estate's non-wrongful death claims, the Court notes that the Estate's claims in Counts I through IV appear to have survived William's death under New Mexico's survival statute.[5]  The survival statute provides:

> In addition to the causes of action which survive at common law, causes of action for mesne profits, or for an injury to real or personal estate, or for any deceit or fraud, shall also survive, and the action may be brought, notwithstanding the death of the person entitled or liable to the same.

N.M. Stat. Ann. § 37-2-1.

"It is clearly understood that contract actions, even at common law, survived the death of either party[.]" <u>Missouri ex rel. Smith v. Greene</u>, 494 S.W.2d 55, 57 n.2 (Mo. 1973) (citing William Holdsworth, <u>History of English Law</u> (3rd ed.) Vol. III at 576-85).  <u>See also</u> <u>Est. of Gaasch v. St.</u>

---

[5]       To be clear, at this stage in the proceedings the Court does not endeavor to decide as a matter of law whether the Estate's claims in Counts I through IV survived William's death under New Mexico's survival statute. Whether claims for breach of contract, bad faith breach of insurance contract, and violations of New Mexico's UIPA and UPA survive death under New Mexico's survival statute appears to be a question of first impression in New Mexico.  Defendants did not raise the issue in their Motion and the Court need not adjudicate the issue at this time. Rather, the Court merely finds that the fact that the Estate's claims in Counts I through IV appear to have survived William's death under New Mexico's survival statute supports the conclusion that New Mexico's Wrongful Death Act did not extinguish those claims.

Paul Fire & Marine Ins. Co., 412 P.3d 1151, 1154 (Okla. 2018) ("Generally, a cause of action in the common law based on contract survived and could be enforced by the personal representative of the deceased."); Kraft Power Corp. v. Merrill, 981 N.E.2d 671, 679 (Mass. 2013) ("At common law, actions based on contract survived the death of a party.") (citations omitted).  As such, the Estate's claims for breach of contract (Count I) and bad faith breach of insurance contract (Count II) appear to survive William's death under New Mexico's survival statute.  See Kraft Power, 981 N.E.2d at 681 (holding that a claim for breach of contract survived the decedent's death and should not have been dismissed).

The Estate's claim for violations of New Mexico's Unfair Insurance Practices Act (Count III)—which prohibits certain practices defined as "unfair and deceptive," N.M. Stat. Ann. § 59A-16-20—also appear to survive William's death to the extent the alleged practices are deceitful and/or fraudulent.  See N.M. Stat. Ann. § 37-2-1 (stating that causes of action for "any deceit or fraud" survive the death of the person entitled to the claim) (emphasis added).  In this regard, the Court observes that Count III alleges that Defendants violated New Mexico's UIPA by, inter alia, "misrepresenting to the Irbys pertinent facts or policy provisions relating to coverages at issue[,]" ECF No. 1-2 ¶ 209(a), which can fairly be characterized as deceitful, and "attempting to settle a claim by an insured for less than the amount to which a reasonable person would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application[,]" id. ¶ 209(f), which can fairly be characterized as fraudulent.  Cf. Breeden v. Hueser, 273 S.W.3d 1, 14 (Mo. Ct. App. 2008) (holding that decedent's claim under Missouri's Merchandising Practices Act survived his death under Missouri's survival statute because "the substance of the claim is the recovery of a monetary loss incurred due to a fraud perpetrated by" the defendant); Matckie v. Great Divide Ins. Co., SUCV20121627G, 2017 WL 3251575, at *4

(Mass. Sup. Ct. 2017) (finding that a statutory claim against an insurer for unfair settlement practices survived the plaintiff's death because such claims were contractual in nature, the "other damage to the person" provision of Massachusetts' survival statute was intended to be flexible, and the "multiple damages" provision of Massachusetts' survival statute was "designed to serve a broad public interest in the eradication of unfair and deceptive practices in trade or commerce").

The Estate's claims for violations of New Mexico's Unfair Practices Act (Count IV)—which prohibits "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce[,]" N.M. Stat. Ann. § 57-12-3—also appear to survive William's death because the alleged practices can fairly be described as deceitful and/or fraudulent.  See N.M. Stat. Ann. § 37-2-1 (stating that causes of action for "any deceit or fraud" survive the death of the person entitled to the claim) (emphasis added).  Specifically, Count IV alleges that Defendants violated New Mexico's UPA by "representing that its Policy had characteristics, uses, and/or benefits that it did not have[,]" ECF No. 1-2 ¶ 216(a), "representing that its Policy and services were of a particular standard, quality or grade but were in fact another[,]" id. ¶ 216(b), "using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact that deceived or tended to deceive[,]" id. at 216(c), and "failing to deliver the quality of coverage and/or services contracted for[,]" id. ¶ 216(d).  See Est. of Cattano v. High Touch Homes, Inc., No. E-01-022, 2002 WL 1290411, at *6-7 (Ohio Ct. App. May 24, 2002) (holding that the decedent's claim under Ohio's Consumer Sales Practices Act, which prohibits unfair or deceptive acts and unconscionable acts or practices by suppliers in consumer transactions, survived his death under Ohio's survival statute, which is identical to New Mexico's survival statute, because "[a]n action under the Consumer Sales Practices Act is, in essence, a fraud claim"); Illinois ex rel. Fahner v. Testa, 445 N.E.2d 1249, 1253-54 (Ill. Ct. App. 1983) (holding that a claim under Illinois'

Consumer Fraud and Deceptive Business Practices Act survived the death of the defendant under Illinois' survival statute because the defendant's acts "may be construed as constituting fraud and deceit"); cf. Vermont v. Therrien, 633 A.2d 272, 275-76 (Vt. 1993) (adopting the general rule that causes of action created by remedial statutes survive the death of the decedent and applying that rule to claims under Vermont's Consumer Fraud Act); Thomes v. Porter, 761 S.W.2d 592, 594 (Tex. Ct. App. 1988) (holding that a consumer's claim under Texas's Deceptive Trade Practices Act survives the consumer's death under common law principles because "[t]o hold otherwise would be to ignore the intent of the legislature in enacting the DTPA and to allow violators to escape the intent just because their victims had the misfortune of dying before they were able to initiate suit").

The fact that Counts I through IV appear to survive William's death under New Mexico's survival statute further supports the rejection of Defendants' apparent argument that the Wrongful Death Act precludes all of Plaintiffs' non-wrongful death claims.

### b.   Whether Count II states a claim for bad faith breach of insurance contract

Next, Defendants argue that even if the Wrongful Death Act does not preclude Plaintiffs' other claims, Count II nevertheless fails to state a claim for bad faith breach of insurance contract. ECF No. 10 at 9.  They argue that under New Mexico's Insurance Code, "an insurer's duties only extend 'to pay or indemnify another' for losses[,]" id. (quoting N.M. Stat. Ann. § 59A-1-5), and the Complaint does not allege that Defendants failed to pay any properly submitted claims, id. at 10 (citing, inter alia, Garcia v. Underwriters at Lloyd's, London, 182 P.3d 113, 120 (N.M. 2008)). They argue that the Complaint instead assigns bad faith to Defendants' handling of the Emergency Transportation provision of the Policy.  Id. at 9, 10.  They appear to argue that the Emergency Transportation provision is not insurance at all and therefore they had no duty to act in good faith. See id. at 10-11 (arguing that the Policy "distinguishes the insurance portion from the

transportation coverage" and therefore "this is not a bad faith insurance case as Plaintiffs claim but rather an emergency transportation case").

Plaintiffs argue that their claims fall under the New Mexico Insurance Code's "travel coverage" and "accident and health" insurance provisions. ECF No. 18 at 19.  They further argue that the Policy refers to itself as "insurance" and was marketed and sold as "insurance."  <u>Id.</u> at 20. They further argue that "New Mexico law does not limit bad faith to the payment of claims."  <u>Id.</u> at 21 (citing N.M. Rules Ann. 13-1701 & Commentary).  Plaintiffs further argue that they have properly pleaded that any unpaid claims were properly submitted to Defendants.  <u>Id.</u> at 22 (citing Compl. ¶ 169).  They further argue that "'[p]roper submission' of claims is not an element of proof required for a bad faith claim."  <u>Id.</u> (citing N.M. Rules Ann. 13-1701 & -1702).

In their Reply, Defendants maintain that Count II concerns emergency transportation services, not a failure to pay an insurance claim.  ECF No. 21 at 5.  They argue that "'[a]n insurer acts in bad faith when its reasons for denying or delaying <u>payment of the claim</u> are frivolous or unfounded.'"  <u>Id.</u> at 6 (emphasis added by Defendants) (quoting <u>Parts Plus of N.M., Inc. v. Tri-State Ins. Co. of Minn.</u>, 646 F. Supp. 3d 1373, 1378 (D.N.M. 2022); <u>see also id.</u> (citing N.M. Rules Ann. 13-1702, -1703, -1704).  They argue that "[n]either the Complaint nor the Response allege that Defendants failed to timely pay the one claim that was properly submitted to Defendants – the emergency evacuation service."  <u>Id.</u>  In this regard, they appear to suggest, without explicitly stating, that even if the Complaint alleges that Defendants delayed <u>arranging for</u> the emergency transportation services, it does not allege that they delayed (or denied) <u>payment of</u> the emergency transportation services, <u>see id.</u> at 6-7, and bad faith claims involve only "the delay or denial of the <u>payment</u> of claims[,]" <u>id.</u> at 6.

"[U]nder the contract of insurance, there is an implied covenant of fair dealing which creates an obligation between the parties to act in good faith." Ambassador Ins. Co. v. St. Paul Fire & Marine Ins. Co., 690 P.2d 1022, 1024 (N.M. 1984). "The cause of action for bad faith arises from a breach of the obligation of good faith." N.M. Rules Ann. 13-1701 (Committee Commentary).

The Court rejects Defendants' argument that "an insurer's duties only extend 'to pay or indemnify another' for losses[,]" ECF No. 10 at 9 (quoting N.M. Stat. Ann. § 59A-1-5), as it misrepresents what the statute actually says. Section 59A-1-5 states, in its entirety: "'Insurance' is a contract whereby one undertakes to pay or indemnify another as to loss from certain specified contingencies or perils, or to pay or grant a specified amount or determinable benefit in connection with ascertainable risk contingencies, or to act as surety." N.M. Stat. Ann. § 59A-1-5.

Here, the Emergency Transportation benefit is listed in the Policy's Declaration of Coverage as providing the insured with $250,000 in "coverage" if "[t]ransportation is needed following a medical emergency while on your trip." See ECF No. 1-2 ¶ 48. The Policy also provides the following description of the Emergency Transportation Coverage in its "Description of Coverages" Section:

> **Emergency Evacuation (Transporting you to the nearest appropriate hospital)**
> If you become seriously ill or injured or develop a medical condition while on your trip and we determine that the local medical facilities are unable to provide appropriate medical treatment:
>
> 1. Our medical team will consult with the local doctor;
> 2. We will identify the closest appropriate hospital or other appropriate facility, make arrangements to transport you there, and pay for that transport; and
> 3. We will arrange and pay for a medical escort if we determine one is necessary.
>
> The following condition applies:
> a. You or someone on your behalf must contact us, and we must make all transportation arrangements in advance. If we did not authorize and arrange the

transportation, we will only pay up to what we would have paid if we had made the arrangements.

* * *

**Repatriation of Remains (Getting your remains home)**
We will arrange and pay for the reasonable and necessary services and supplies to transport your remains to one of the following:

1. A funeral home near your primary residence; or
2. A funeral home located in the U.S.

This benefit does not include funeral, burial, or cremation expenses, or related containment expenses for items such as a casket, urn, or vault.

The following conditions apply:
a. Someone on your behalf must contact us, and we must make all transportation arrangements in advance. If we did not authorize and arrange the transportation, we will only pay up to what we would have paid if we had made the arrangements; and
b. The death must occur while on your trip.

**IMPORTANT:** The most we will pay for benefits under your Emergency Transportation coverage is the maximum benefit listed for Emergency Transportation Coverage on your Declarations. Please refer to your Declarations to confirm your applicable limit.

See id. Without question, the Emergency Transportation Coverage is a "determinable benefit in connection with ascertainable risk contingencies." N.M. Stat. Ann. § 59A-1-5. As such, it was an aspect of the insurance Policy concerning which Defendants had a duty to act in good faith. See N.M. Rules Ann. 13-1701 ("An insurance policy is a contract that creates a special relationship between an insurer and insured which requires an insurer to deal fairly, reasonably, honestly, and in good faith with its insureds in all aspects of the insurance contract.").

Furthermore, the New Mexico Court of Appeals has implicitly rejected Defendants' argument that "an insurer's duties only extend 'to pay or indemnify another' for losses." ECF No. 10 at 9 (quoting N.M. Stat. Ann. § 59A-1-5). Specifically, in O'Neel v. USAA Insurance Co., the

court of appeals affirmed the jury's finding of a bad faith breach <u>because</u> "the record contain[ed] evidence to support a finding of bad faith against [the insurer] based on conduct <u>separate from [the insurer's] refusal to pay [the insured]</u> . . . ." 41 P.3d 356, 359 (N.M. Ct. App. 2002).  The court cited, <u>inter alia</u>, "evidence from which the jury could find that [the insurer's] investigation was excessive and unnecessarily invasive[,]" <u>id.</u>, including that it subjected the insured "to two lengthy examinations during the claims review process and required [the insured] to produce substantial documentation about his personal financial condition and history, which the jury could have concluded was not specifically required under the terms of [the insured's] policy." <u>Id.</u>  Thus, <u>O'Neel</u> demonstrates that an insurer's duty of good faith extends beyond the duty to pay or indemnify for losses.

Here, the Complaint alleges sufficient facts from which the Court can plausibly infer that Defendants acted in bad faith in dealing with the Irby's request for Emergency Transportation Coverage.  Shortly after returning from their initial visit to the Turks and Caicos hospital on November 6, 2021, the Irbys called Defendants to open a claim for emergency medical evacuation coverage.  ECF No. 1-2 ¶ 65.  William explained to the representative that he received a heart transplant in 2016, that he was ill with COVID, and that the doctors had instructed him to evacuate as soon as possible because they did not have the ability to treat his condition.  <u>Id.</u> ¶ 69.  The representative asked the Irbys to email William's medical records to him, which Angela did shortly after the call.  <u>Id.</u> ¶¶ 71, 76.  The representative informed the Irbys that Defendants would review the medical records and would get back to them shortly as to whether emergency evacuation coverage would be provided.  <u>Id.</u> ¶ 75.

The Irbys did not hear back from Defendants on November 6th or 7th.  <u>Id.</u> ¶¶ 77-79.

On November 8, 2021, Angela called Defendants as William's condition worsened. Id. ¶¶ 79-80. Defendants "had done nothing to approve the Emergency Medical Evacuation claim, now two days after the claim was opened." Id. ¶ 85. Over the course of the day, Angela had at least three phone conversations with Defendants' representatives, including two case managers and a nurse consultant, and was required to explain to each of them the need to immediately evacuate William. Id. ¶¶ 80-96.

Angela called Defendants again on the morning of November 9, 2021, informing a case manager that William's breathing was getting worse and that he was in pain, and reiterating that William needed to be evacuated immediately. Id. ¶¶ 97-98, 101. The case manager promised to reach out to Defendants' medical team and then call Angela back shortly. Id. ¶ 108. In the meantime, William's condition continued to decline to the point where Angela called an ambulance to take William back to the hospital. Id. ¶¶ 109-10. Plaintiffs allege that at some point after William was readmitted to the hospital in Turks and Caicos on November 9, 2021, Defendants finally began efforts to secure a medical air evacuation for William. Id. ¶ 116. Later that evening, one of Defendants' representatives called Angela and reported that the Turks and Caicos airport would close shortly and it was possible that the air evacuation would not take place until the next morning. Id. ¶ 117. Angela called Defendants back that evening and told Defendants that the doctor wanted William evacuated that night and that the doctor would arrange to keep the airport open if Defendants arranged for an aircraft. Id. ¶ 118. Later in the evening, one of Defendants' representatives called Angela to tell her that they would not be able to transport William that evening. Id. ¶¶ 122, 124.

Ultimately, Defendants contracted with a medical air evacuation company to charter a flight from Turks and Caicos to Miami, id. ¶ 128, and the Irby's were flown from Turks and Caicos

to Miami late in the afternoon on November 10, 2021, id. ¶ 132—some four days after the Irby's initially contacted Defendants and requested the Emergency Transportation coverage.

Accepting these allegations as true and construing them in the light most favorable to Plaintiffs, Defendants had all of the information they needed to make a decision on Plaintiffs' request for Emergency Transportation coverage on the evening of November 6, 2021, when Angela provided Defendants with the documents they requested.  Then, for the next three days, Defendants jerked Plaintiffs around, passed them from representative to representative, requested unnecessary information, and subjected them to unnecessary questioning during unnecessary phone calls, frivolously delaying approval of their Emergency Transportation Coverage until the evening of November 9, 2021.  In this light, the Court finds that the Complaint plausibly alleges that Defendants acted in bad faith in handling the Irby's request for Emergency Transportation coverage under the Policy.  See O'Neel, 41 P.3d at 359-60.

### c.   Whether the Complaint states a claim under New Mexico's Unfair Practices Act

Finally, Defendants argue that even if Count IV is not precluded by the Wrongful Death Act, it fails to state a claim under New Mexico's Unfair Practices Act.  ECF No. 10 at 11. Specifically, they argue that Plaintiffs failed to plausibly allege the fourth element of an UPA claim, "that Defendants' alleged misrepresentation was one that tends to mislead or deceive."  Id.  They concede that the Complaint alleges that Defendants made a representation that "did, in fact, 'deceive or mislead' the Irbys," id. (citing ECF No. 1-2 ¶ 215), but argue that the Complaint fails to allege that Defendants' alleged misrepresentation is of a type that "'tend[s] to deceive o[r] mislead people,'" id. (purporting to quote Raja v. Ohio Sec. Ins. Co., 305 F. Supp. 3d 1206, 1232 (D.N.M. 2018)).

The Court finds that Defendants' argument is premised on a misleading representation of their own—specifically, what the fourth element of a claim under New Mexico's UPA requires the plaintiff to plead and prove.

A claim under New Mexico's UPA has four elements:

First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading. Second, the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts." Third, the conduct complained of must have occurred in the regular course of the representer's trade or commerce. Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person."

Raja, 305 F. Supp. 3d at 1232 (emphasis added) (quoting Stevenson v. Louis Dreyfus Corp., 811 P.2d 1308, 1311 (N.M. 1991)).  Thus, the fourth element of an UPA claim does not require the plaintiff to allege that the defendant made a representation that tends to mislead "people," as Defendants assert.  ECF No. 10 at 11.  Rather, the plaintiff must allege that the defendant made a representation that "may, tends to or does, deceive or mislead any person."  Stevenson, 811 P.2d at 1311 (emphasis added).

Here, the Court finds that the Complaint plausibly alleges that Defendants made representations that tended to and/or did mislead two persons—William and Angela Irby. Specifically, the Complaint contains a reproduction of one of Defendants' advertisements, which provides:

**Here are real-world scenarios for how benefits may apply under plans containing the Epidemic Coverage Endorsement.**

\* \* \*

**Emergency Medical Transportation If You Are Diagnosed with COVID-19 While Traveling**

*Scenario: After months stuck at home, you decide it's time for a radical change of scenery. You book a tiny beach bungalow in the town of Xcalak, on Mexico's Costa Maya, and settle in for a week of fishing and sunbathing. Five days into your trip, you come down with a fever and begin feeling short of breath. The local clinic diagnoses COVID-19, but they're not equipped to treat you. How can your travel insurance plan with the Epidemic Coverage Endorsement help?*

If you're diagnosed with an epidemic disease such as COVID-19 while you're traveling and you require an emergency medical evacuation, then your Emergency Transportation benefit can help. Our medical team will consult with the local doctor. If they determine that the local medical facilities are unable to provide adequate treatment, then our team can arrange and pay for emergency medical transportation to the nearest appropriate hospital.

ECF No. 1-2 ¶ 45. Count IV incorporates this advertisement by reference, id. ¶ 213, and alleges that Defendants "made false and/or misleading oral and written statements, visual descriptions, and other representations which tended to and/or did deceive or mislead the Irbys." ECF No. 1-2 ¶ 215. The Court finds that when construed in the light most favorable to Plaintiffs, the Complaint plausibly alleges that the advertisement reproduced in Paragraph 45 tended to and/or did deceive William and Angela Irby. As such, Count IV plausibly alleges the fourth element of a claim under New Mexico's UPA.

## V.      Conclusion

Therefore, it is **HEREBY ORDERED** that Defendants' Partial Motion to Dismiss per Fed. R. Civ. P. 12(b)(6), ECF No. 10, which the Court construes as a Motion for Judgment on the Pleadings, is **DENIED**.

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE